# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In Re  Randy Joseph Domagalla

|  | ) | |  |
|---|---|---|---|
|  | ) | Bankruptcy No. | 10-32206 |
|  | ) | | |
| Debtor. | ) | Chapter | 7 |

## COVER SHEET FOR APPLICATION FOR PROFESSIONAL COMPENSATION
### (IN CASES UNDER CHAPTERS 7, 11 AND 12)

Name of Applicant: _____ Bruce Dopke _____

Authorized to Provide Professional Services to: _____ Deborah Kanner Ebner, Trustee _____

Date of Order Authorizing Employment: _____ March 16, 2012 _____

Period for Which Compensation is Sought:
From _____ March 5 _____, 2012 _____ through _____ September 30 _____, 2013 _____

Amount of Fees Sought:  $ 78,971.00 (includes $26,883.00 previously allowed)

Amount of Expense Reimbursement Sought:  $ 4,796.00 (includes $1,494.96 previously allowed)

This is an:    Interim Application _____        Final Application ✓

If this is *not* the first application filed herein by this professional, disclose as to all prior fee applications:

| Date Filed | Period Covered | Total Requested (Fees & Expenses) | Total Allowed (Fees & Expenses) | Fees & Expenses Previously Paid |
|---|---|---|---|---|
| 9/13/12 | March 5 - Sept. 12, 2012 | $30,900.96 | $28,377.96 | 0 |

Dated:  September 30, 2013 _____          /s/ Bruce Dopke
                                                    (Counsel)

(Rev 11/19/10)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 7 |
| | § | Case No.: 10-32206 |
| RANDY JOSEPH DOMAGALLA, | § | (Joliet) |
| | § | |
| | § | |
| Debtor. | § | |
| | § | Hon. Bruce W. Black |

### MOTION OF BRUCE DOPKE FOR ALLOWANCE
### OF FINAL COMPENSATION AND REIMBURSEMENT OF
### COSTS AND EXPENSES FOR HIS SERVICE AS
### COUNSEL TO THE CHAPTER 7 TRUSTEE

Applicant Bruce Dopke, counsel to Deborah Kanner Ebner, the duly appointed trustee of

this chapter 7 case (the "Trustee") files this motion (the "Motion") for entry of an order which

allows Mr. Dopke final compensation and reimbursement of costs and expenses for his services

to the Trustee during the time period of March 5, 2012 through September 30, 2013 under 11

U.S.C. §330. In support of the Motion, Mr. Dopke respectfully represents as follows.

1.      The Debtor filed a voluntary chapter 12 petition in this judicial district and

division on July 20, 2010.

2.      The Debtor voluntarily converted his case to a case under Chapter 7 of the

Bankruptcy Code on January 9, 2012.

3.      At the initial date of the 341 meeting convened in the chapter 7 phase of this case

on February 13, 2012, the Trustee was elected to serve as permanent trustee in the Debtor's case

pursuant to 11 U.S.C. §702 (Doc. 107).

4.      The Court entered an order which approved Mr. Dopke's employment as general

counsel to the Trustee on March 16, 2012 (Doc. 136).

-1-

5.      Acting pursuant to section 331 of the Bankruptcy Code (11 U.S.C. §330), the

Court entered an order on December 12, 2012 (Doc. 211) which made the following allowances

to Mr. Dopke for work performed between March 5, 2012 and September 12, 2012 (the "Interim

Period"):

| | |
|---|---|
| interim compensation: | $ 26,883.00 |
| interim costs & expenses: | $  1,494.96 |
| Total Allowance: | $ 28,377.96 |

Through this motion, Mr. Dopke would ask for the approval of the foregoing amounts on a final

basis.

6.      Between September 13, 2012 and September 30, 2013 (the "Current Time

Period"), Mr. Dopke incurred 175.9 hours of professional time, which, at Mr. Dopke's current

and historical hourly billing rates ($290 for the period from September 13, 2012 through and

including May 31, 2013, and $300 per hour thereafter), has a time value of Fifty-Two Thousand

Eighty-Eight Dollars ($52,088.00). In compliance with Local Rule 5082-1 B (1)(a), the

following chart contains a summary list of all principal activities of Mr. Dopke, including the

total compensation requested by Mr. Dopke in connection with each category of activity in the

Current Time Period:

| Code and Description | | Hours | Time Value |
|---|---|---|---|
| AD | Case Administration | 5.9 | $  1,711.00 |
| CT | Court Appearance | 10.0 | $  2,913.00 |
| L1 | Litigation - Bayview & First Midwest | 152.7 | $ 45,274.00 |
| SOP | Sale of Property | 1.3 | $     390.00 |
| FEE | Preparation of Fee Application | 6.0 | $  1,800.00 |
| Totals: | | 175.9 | $ 52,088.00 |

-2-

7.    As required by Local Rule 5082-1 B (1)(b) and by Federal Rule of Bankruptcy

Procedure 2016(a), Exhibit A attached hereto contains a separate and detailed description of

each of Mr. Dopke's principal activities for the Trustee during the Current Time Period covered

by this Motion, in chronological order, including details as to individual tasks performed within

such activity, and a description sufficient to demonstrate to the Court that each task and activity

is compensable in the amount sought. Exhibit B contains these same time entries, broken down

into the six categories of service noted in the preceding paragraph of this Motion. In addition to

those time entry exhibits, Mr. Dopke would add the following narrative with respect to each of

the categories of service.

### "AD" - Case Administration

Mr. Dopke incurred 5.9 hours of time, with a value of $1,711.00 in this category. By the

end of the Interim Period, the Trustee had decided to make an interim distribution to creditors,

and had received the blessing of the United States Trustee's office to do so. This was done for a

number of reasons, including a determination that the estate had sufficient funds to make a

distribution and fund the litigation which by then had been brought against creditors Bayview

Loan Servicing LLC ("Bayview"), and First Midwest Bank (the "Bank")(and collectively,

hereinafter, the Defendants). However, the Defendants and certain other creditors (most

importantly, Growmark/Heritage FS (which funded the Debtor's 2010 and 2011 crop inputs)

and the Internal Revenue Service ("IRS") held claims against the estate. In order to make an

interim distribution, these claims and others needed to be estimated or, in the case of the IRS,

amended. The IRS' tax claims against the estate created their own special problems because a

recent United States Supreme Court decision (*i.e., Hall v. United States (In re Hall)*, 132 S. Ct.

1882 (2012)) upended some previously conceived notions of the appropriate treatment of capital

gains in chapter 7 and 12 bankruptcy, with the practical effect, in this case, of making the estate

responsible for the payment of income taxes incurred by the Debtor during the chapter 12

administration, while the Debtor, personally, was responsible (without contribution from the

estate) for tax penalties incurred with respect to those principal tax debts. The proposed interim

distribution, therefore, was not only a matter which would be welcomed by the unsecured

creditors of the estate as a whole, but it was also a matter of fairness to the Debtor, whose labor

and, either canny judgment or plain luck (or both) had resulted in very profitable farming

operations during the chapter 12 phase of the case, which made the distribution possible. Most

of the 5.9 hours of time spent in this category was devoted, not to the mechanics of the

distribution to be made, but to the preparation of the interim distribution motion (which is itself

an uncommon measure in these types of cases, to be sure), the disposition of the IRS claims,

without litigation, but through the negotiated amendment of the IRS claim against the estate, as

well as the negotiation of agreed orders on all of the claims estimation motions which had been

brought before the Court. Of these, the estimation of the substantial alleged unsecured claims of

the Defendants (Bayview and the Bank) was the most sensitive matter, and an agreement

(reflected in the terms of this Court's order dated September 14, 2012 (Doc. 194) struck an

appropriate balance between the estate's rights, and the rights of the Defendants, as potential

creditors of the estate. The Court entered an order which approved the interim distribution on

October 19, 2012 (Doc. 210) and the distribution was promptly made thereafter.

### "CT" - Court Appearance

Mr. Dopke is seeking final compensation for 10.0 hours of time, with a value of $2,913.00, which arise from seven court appearances in the Current Time Period. As noted in the time entries, Mr. Dopke discounts his time to between 40% to 50% of the actual time incurred in these activities which generally require a two-hour round trip commute to Joliet, plus the actual time spent in Court, which varied with the length of the call and the position of the Domagalla motions on that call. On most of these appearances, Mr. Dopke was able to schedule hearings on the adversary proceeding involving the Defendants with hearings on other pending motions in this case, in order to minimize the need for multiple court appearances.

### "L1" - Litigation - Bayview and First Midwest Bank

In the Current Time Period, Mr. Dopke incurred 152.7 hours of time, with a value of $45,274.00 in this category. As noted in our interim fee application, on July 19, 2012, the Trustee commenced suit against the Defendants to recover certain transfers which the Defendants had received both prior to and following the commencement of the Debtor's chapter 12 case (Doc. 164)(the "Complaint"). The Complaint sought to recover the pre-petition transfers as preferences under 11 U.S.C. §547 and the post-petition transfers as unauthorized transfers avoidable under 11 U.S.C. §549. As noted in the docket or the time sheets (see Exhibit B, starting at page 5), the Defendants filed their answer and affirmative defenses to the Complaint in mid-October of 2012. An agreed pretrial order was prepared and presented to the Court on December 7, 2012 (Doc. 25 in adversary case 12-1183). Mr. Dopke prepared and exchanged initial Rule 26 disclosures with the Defendants' counsel on December 21, 2012. Written discovery was thereafter pursued, which required a substantial expenditure of time, as the

-5-

Defendants produced over 17,000 pages of documents to the Trustee, and both sides exchanged interrogatories and pursued discovery from third parties.

Mr. Dopke prepared for and on July 24, 2013, conducted an examination of the Debtor (which was a continuation of the Rule 2004 examination which was commenced in June of 2012, and adjourned early as a result of an urgent commitment of the Debtor). Although conducted under Rule 2004, the examination focused on the facts which, as Mr. Dopke's continuing research disclosed, were critical to the preference theories asserted in the Complaint. Immediately following that Rule 2004 examination, and by pre-arrangement, the Defendants conducted a Rule 30 examination of the Debtor, which Mr. Dopke attended.

There was no dispute between the Trustee and the Defendants that transfers had, in fact, been made by the Debtor to or for the benefit of the Defendants. The dispute centered on the preference defenses created by the Code. The Trustee's position was that 11 U.S.C. §547(c)(5) was the principal and indeed, only section of the Bankruptcy Code which governed the Defendants' preference liability. The Bank was a secured party with liens on the Debtor's inventory (i.e., his growing crops and livestock, 11 U.S.C. §547(a)(1)) and accounts receivable, and proceeds. Under Code section 547(c)(5), the Defendants' preference exposure was based on the improvement of the Bank's secured position in the 90 day preference period. That improvement, under the statute, would necessarily be determined by fluctuations in the value of *all* of the Bank's collateral including:

a.   Deposit accounts held at the Bank;

b.   The Debtor's crops, which were planted both before and after the preference period began;

c.    The Debtor's livestock;

d.    The Debtor's tangible farming assets, including such items as fertilizer, pesticide, seed, tools, feed, hay, etc.;

e.    The Debtor's machinery and equipment; and

f.    Payments which Bayview, as the Bank's agent, received from the Debtor prior to the commencement of the Debtor's Chapter 12 case.

*Intangible Personal Property - FSA Payments, Crop Insurance and Cash*

Although at the beginning of discovery, there were substantial issues between the parties with respect to whether the Bank or another creditor, Heritage FS (which had funded the planting of the Debtor's 2010 crop and took liens on that crop and proceeds, and to which Peotone Bank had subordinated its secured position) had a first lien on the Debtor's right to receive about $38,000.00 of USDA program payments and about $150,000.00 of federal crop insurance payments which the Debtor received, mostly after the commencement of bankruptcy. This point became moot when third-party discovery, conducted and completed in early August 2013, revealed that neither the Bank nor Heritage FS had an effective pre-petition lien on these property rights.

The cash payments which the Debtor made to the Defendants were determined, first, by going through the Debtor's statements of his primary checking account (with the Harris Bank) and a secondary account that was with Peotone Bank/First Midwest Bank), to determine what payments were made. Then, after Mr. Dopke located the six to ten pages of reports (from among the 17,000+ pages of documents received from the Defendants in discovery) which showed the historical application of payments and charges to the three loans which made up the Bank's

-7-

claim against the Debtor, as well as the original promissory notes which evidenced the Bank's

claim against the Debtor, he was able to calculate the loan balances as of the commencement of

the preference period. This indicated that the Bank's claim against the Debtor had decreased

from $1,384,595.67 at the beginning of the preference period, to $1,238,437.78, as of the date of

Bankruptcy. This improved the Bank's position by $146,157.59. However, the Bank's net

secured claim, at the beginning and end of the preference period, was also necessarily based on

fluctuations in the value of the Debtor's *tangible* personal property during the preference period

and thereafter. This calculation involved some fairly unique challenges and novel issues.

## Livestock

During the preference period, the Debtor had about 160 head of cattle which he kept, not

for breeding but for slaughter later in the Fall of 2010. He also had an undetermined number of

cattle which either belonged to him, or belonged to his neighbor, whom the Debtor was assisting

(both prior to and after the commencement of the Chapter 12 case) by purchasing cattle on the

Debtor's account, for which the neighbor would reimburse the Debtor (cow arbitrage, in effect).

The Debtor apparently made some substantial profits from this activity, which was shown in his

bank statements and in the report which the Debtor filed with the Court following the conversion

of the case to Chapter 7 (Doc. 151). But during the chapter 12 case itself, these cattle purchases

and sales were poorly recorded, and were not reported to creditors, the Trustee or the Court. It

took considerable time (including time spent examining the Debtor under Rule 2004) and, prior

to that, many hours spent reviewing the Debtor's bank records, to sort the proceeds of sale of the

cattle which the Debtor actually owned (which the Bank arguably had a first lien on) from the

Debtor's substantial expenses and receipts from his arbitrage activities. The best we could do

-8-

was to determine that the Debtor's livestock was worth about $170,000.00 at the beginning of

the preference period, and about $160,000.00 at the end of that period.

**Crops**

An abundance of records were available from the Debtor, Heritage FS, the United States

Department of Agriculture, Farm Service Administration (the "FSA"), RCIS (a provider of

federal crop insurance), grain co-operative associations and others with respect to the

circumstances, cost, and significant profits on Debtor's 2010 corn and soybean crops. Farming

is a federally regulated business. The Debtor's reports to the FSA indicated that the Debtor

planted about 80% of his 2010 corn crop before the preference period began, and the remaining

20% of his corn crop and all of his soybean crop was planted thereafter. The Defendants

claimed a first lien on all of these crops, based on a contention that all of the seed for these crops

was purchased prior to the preference period (a contention later proved to be erroneous by

supplemental discovery received from Heritage FS). Until that supplemental discovery was

received and processed, the Defendants took a firm position with the Trustee (based, we believe,

on a single reported chapter 12 decision) that all of the Debtor's crops were proceeds of seed

purchased prior to the preference period, and that consequently, the Defendants had no

preference liability to the estate. Of course, the Trustee responded to this by citing the single

reported decision that our research disclosed which contained a contrary holding. Ultimately,

our continuing research and analysis caused us to believe that neither of the two case decisions

were either correct or directly applicable to the facts of this case, and we had to look elsewhere

to find a legal position, for the estate, that struck a correct and defensible balance between the

rights of the estate to recover the improvement of the Bank's position in the preference period

under 11 U.S.C. §547(c)(5), while affording the Defendants their rights as a secured party with a perfected lien on proceeds under 11 U.S.C. §552.

Another complication which required some considerable research and analysis arose from a subordination agreement which had been entered into by the Debtor, the Bank's predecessor in interest (Peotone Bank) and Heritage FS (the "Subordination Agreement"). Prior to 2010, the Peotone Bank had financed the Debtor's farming operations. The Debtor testified, credibly, that he was informed in December 2009, by Peotone Bank, that the bank was in financial trouble and that it would not be able to finance the Debtor's farming operations in 2010. As a result, the Debtor obtained financing for his 2010 operations from Heritage FS, which insisted that Peotone Bank subordinate its interest in the 2010 crop to the advances which were to be made by Heritage FS to the Debtor. The Subordination Agreement was undisputably signed by the loan officer which had previously administered Peotone Bank's loans to the Debtor, who had the title of a senior vice president to that organization. However, apparently, there was no evidence that the Subordination Agreement was ever reviewed or approved by the board of directors of Peotone Bank. A few months after that Subordination Agreement was signed, Peotone Bank was placed in receivership with the Federal Deposit Insurance Corporation (the "FDIC") which assigned the Debtor's loans from Peotone Bank to First Midwest Bank. The Defendants later seized on these circumstances (i.e., the absence of documentation of board approval of the Subordination Agreement and the fact of the FDIC's involvement) to support an affirmative defense which the Defendants raised in their Answer to the Complaint, that the that the Subordination Agreement was unenforceable against the Bank (in its capacity as an assignee of the FDIC), based on 12 U.S.C. § 1823(e) and *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447

(1942). Mr. Dopke spent a moderate amount of time reviewing these facts and circumstances, including legal research concerning them, before coming up with an effective response as described below.

As oral discovery began to wind up in late July 2013, and the legal and factual issues involved in this case began to crystalize for both parties, a very lively and open exchange of authorities and legal positions was engaged in by the parties. This led, initially, to the notion that the parties should meet and try to find a way to minimize the cost of the remaining discovery to be conducted, and begin work on identifying those material facts which were not in dispute. At that time, both sides were contemplating taking additional depositions (the Defendants wanted to take the Trustee's deposition, and the Trustee was contemplating taking a Rule 30(b)(6) deposition of one or both of the Defendants). Mr. Dopke understood that he would have to invest some additional time to develop the testimony of the expert retained to value the Debtor's farm equipment and machinery (Mr. Don Dodge and American Auctions). A motion was filed in August 2013 to authorize the Trustee to retain another expert, Mr. Don McCabe, to provide expert valuation testimony concerning the Debtor's 2010 growing crops during the preference period. Thus, Mr. Dopke and the Trustee were aware that if the matter was not settled, the estate would likely incur significant legal and expert witness fees, expenses and costs. Apparently, the Defendants were looking at matters in the same way, with the result that a meeting, which was initially scheduled for mid-August 2013, and was rescheduled (due to transportation issues) to August 29, 2013, should focus on settlement rather than discovery and pretrial issues.

Mr. Dopke prepared for the August 29, 2013 settlement meeting in the same way that he would prepare for any mediation – with an intense period of examination and analysis of the records, the deposition testimony and the governing legal authorities, which as noted above, were surprisingly scarce.  Mr. Dopke, accompanied by the Trustee, came to the August 29, 2013 meeting and made a detailed presentation of the Trustee's position, backed by demonstrative exhibits, which we summarize as follows:

a.   Although the Subordination Agreement might be ineffective a "subordination agreement" under *D'Oench Dhume*, it was perfectly effective, under Article 9, section 9-324 of the Uniform Commercial Code to put Peotone Bank on timely notice that Heritage FS had taken a perfected purchase money security interest in the Debtor's 2010 crop, which placed Heritage FS in a first lien position on the 2010 crop.

b.   The Trustee's proposed crop valuation expert (Mr. McCabe) would likely value the 2010 crops, at the beginning of the preference period, at a value which was equal to the amount of Heritage FS' senior lien claim against that crop.

c.   That although there were no bankruptcy decisions on this point, there was a substantial body of decisions, coming from federal income tax disputes, which indicate that a growing crop may be valued, at different points in the crop's maturity, based on contingencies affecting the crop, including weather and time, with the result that the value of the Debtor's 2010 crop which was available to support the Defendant's junior lien on the 2010 crop would likely have increased

-12-

from zero (at the beginning of the preference period) to approximately

$217,000.00 by the commencement of bankruptcy.

These, and other factors which had a lesser impact on the improvement in the Bank's secured

position, indicated that the Defendants had preference exposure, under 11 U.S.C. §547(c)(5), of

approximately $328,018.29. This did not end the discussion, however.

As noted in the Complaint, the Debtor made substantial payments to the Defendants,

after the commencement of bankruptcy and without the knowledge of other parties to the case

(including the Trustee) and the Court. Mr. Dopke, after examining every post-petition receipt

which the Debtor received while the case was pending under chapter 12, and the substantial

evidence of where those payments came from (including the Debtor's deposition testimony),

determined that the Defendants received a net overpayment from the Debtor of $144,732.42

which was avoidable under 11 U.S.C. §549. So, the *ad damnum* which Mr. Dopke and the

Trustee presented to the Defendants at the August 29, 2013 settlement conference was

$472,750.71, comprised of:

> $328,018.29   avoidable under 11 U.S.C. §547(b) and (c)(5); and
>
> $144,732.42   avoidable under 11 U.S.C. §549
>
> $472,750.71   Total *ad damnum*

Ultimately, the August 29, 2013 settlement conference was successful. The parties agreed to

settle the Complaint in exchange for a cash payment by the Defendants to the estate of

$210,000.00 *plus* a waiver of the Defendants' claims against the estate. The claim waiver was a

substantial component of the settlement. The agreed order through which the Defendants'

claims were estimated (Doc. 210) valued the Defendants' claim at $246,238.08. In the interim

distribution made in 2012, other unsecured creditors received a 10% distribution on their claims.

Although we are not in a position to put a precise value on the claim waiver, we would estimate

that with an approximately 18% final distribution, the Defendant's claims would have been

worth approximately $44,000.00.  Thus, we view the settlement as having recovered

approximately $254,000.00 for the benefit of the estate.  For this recovery, Mr. Dopke incurred

the following fees:

| | |
|---|---|
| $ 3,509.00 | during the Interim Period, on preparing and commencing the case; |
| $ 45,274.00 | during the Current Period on pretrial litigation and discovery; and |
| $ 48,783.00 | total legal fees on the Bayview/FMB matter *for the entire case*. |

The $48,783.00 in legal fees incurred on the Bayview/FMB matter represents approximately

19.2% of the ultimate benefit which the estate has obtained as a result of Mr. Dopke's efforts.

We believe that this was a very satisfactory result, achieved at a reasonable expense given the

great legal and factual complexity of the matter, the strength of the Defendants' position, the

numerous important legal issues presented in the case which had very little precedent, if any, in

the reported decisions, among other factors.

### "SOP" - Sale of Property

Mr. Dopke incurred 1.3 hours of time, with a value of $390.00 in this category.  During

the discovery phase of the Bayview/First Midwest Bank litigation, Mr. Dopke determined that a

crop of winter wheat which had been planted prior to the conversion of the Debtor's case to

chapter 7, had been harvested and sold for $17,369.03 after the case was converted.  The Debtor

offered to pay the estate the $8,680.00 cost of the seed which was used for that crop, and the

Trustee took the Debtor up on this offer through the motion to "sell" that seed to the Debtor

-14-

which Mr. Dopke prepared and filed on September 6, 2013.  This $390.00 charge is the all-in

cost to the estate of recovering the $8,680.00 from the Debtor, which the Court approved on

September 20, 2013 (Doc. 220), and it represents approximately 4.5% of the net sum recovered.

### "FEE" - Preparation of Fee Applications

Mr. Dopke incurred 11.5 hours of time, with a time value of $3,450.00, preparing this fee

application its four exhibits.  However, in his billing judgment, Mr. Dopke has limited his

request for compensation for these activities to six hours of time, with a value of $1,800.00.  A

significant amount of this time was spent providing detail in the narratives contained in this

Motion, so that the Court could perform its obligation under the Code to insure that an

appropriate allowance of fees, expenses and costs is made to Mr. Dopke as a representative of

the estate.

8.      Exhibit C to this Motion contains an itemization and a summary of the $3,301.04

in out-of pocket costs and expenses which Mr. Dopke incurred during the Current Time Period.

Exhibit D to this Motion presents this same information, presented or grouped by the following

cost and expense categories:

| Description | Charge |
|---|---|
| Copy Expense | $   141.52 |
| Misc | $     19.90 |
| Postage | $     59.42 |
| Transcripts | $ 1,926.20 |
| Travel | $     31.00 |
| Witness and Service Fees (for Discovery Subpoenas) | $ 1,123.00 |
| ***Total Costs in the Current Time Period*** | *$ 3,301.04* |

We would provide these comments, with respect to these expenditures.

-15-

*Copy Expense - $141.52*

All of the duplication expense was incurred at the rate of $.09 per page. The dates and matters for which these expenses were incurred are detailed in Exhibit D.

*Misc - $19.90*

In preparation for Mr. Domagalla's July 2013 examination, Mr. Dopke ordered a short term (3-day) subscription to a service which allowed him to access temperature and precipitation data for the areas in which the Debtor planted his 2010 soybean and corn crops. This information was used, in part, to test the Debtor's testimony concerning the planting dates of those crops, which related to some of the issues presented in the preference claims which the Trustee asserted against FMB and Bayview.

*Postage - $59.42*

Postage expense is strictly limited to out-of-pocket expenditures on correspondence, pleadings and discovery materials transmitted in connection with this case. The dates and matters for which these expenses were incurred are detailed in Exhibit D.

*Transcripts - $1,926.20*

As detailed in Exhibit D, this is the actual amount paid by Mr. Dopke to the court reporter for an original copy of the Rule 2004 examination of the Debtor which Mr. Dopke took on July 24, 2013, plus the cost of a copy of the Rule 30 examination of the Debtor which was taken by counsel for FMB/Bayview on that same day (July 24, 2013), minus a credit of $73.50 which Mr. Dopke received from counsel to FMB/Bayview, pursuant to counsels' agreement to jointly bear the costs of both deposition transcripts.

*Travel*

Mr. Dopke generally does not charge clients out-of-pocket expenses or mileage associated with court appearances within the Chicago area. The sole travel charge is a $31.00 parking fee for the Grant Park Garage in Chicago on August 29, 2013, which Mr. Dopke incurred only because the Metra commuter train which he had planned to take to the settlement conference with Bayview and First Midwest Bank broke down, requiring Mr. Dopke to drive downtown to the meeting location. No mileage, or other travel related expenses, have been charged to the estate by Mr. Dopke.

*Witness Fees*

Mr. Dopke incurred $1,123.00 of out-of-pocket expenses on witness fees and service fees. The majority of this involved the service, by special process servers, of discovery subpoenas on non-parties to this case, including $125.00 paid to effect service on Edward Smith, who had sold some of the Debtor's farm machinery during the case, $150.00 paid to effect service on the Prairie Creek Grain Co., which had purchased a substantial portion of the Debtor's 2010 corn and soybean crop, and $700.00 to effect service on Gehl Finance, which had financed some of the Debtor's farm machinery purchases prior to the commencement of the case. The differences in these service costs was a direct effect of the distance which the process servers had to go. The Gehl Finance subpoena, for example, was served on Gehl's headquarters in West Bend, Wisconsin, as that entity had no place of business in Illinois. Of these three subpoenas, the ones that cost the least amount (Mr. Smith and Prairie Creek) yielded the most valuable information, but Mr. Dopke felt that the needs of the case required an inquiry from all three of these entities. Mr. Dopke obtained information, where he could, from other entities at little or no cost and

without the requirement of subpoenas, including significant information received from the

USDA/FSA, RCIS, John Deere Credit and Heritage FS. However, the three entities which were

served with subpoenas (Smith, Prairie Creek and Gehl), in Mr. Dopke's judgment, needed to be

subpoenaed. Mr. Dopke will leave it to the Court's sound discretion to determine how much, if

any, of the service fees incurred for these three entities should be reimbursed to him.

It is Mr. Dopke's firm policy to *never* charge his clients for overhead items (such as

telephone, computer assisted research, add-on charges for fax transmittals or receipts, etc.). No

expense item is ever subject to a surcharge. All of the above cost and expense requests are for

monies paid by Mr. Dopke in connection with this case or the related adversary proceeding

against Bayview and First Midwest Bank.

9.      Except for the Court-approved $28,377.96 of interim compensation and

reimbursement of expenses which Mr. Dopke received from the Trustee in December of 2012,

no payments have been made or promised to Mr. Dopke for services rendered or to be rendered

by him to the Trustee in any capacity whatsoever in connection with the case.

10.     In connection with the Court's order dated October 19, 2012 (Doc. 210), Mr.

Dopke received a $10,000.00 cost retainer with respect to this case. No draws have been made

against this cost retainer. As a part of this motion, Mr. Dopke asks the Court's leave to apply

that cost retainer against any allowances of compensation and reimbursement of costs and

expenses incurred during the Current Time Period which the Court may grant to Mr. Dopke

pursuant to this Motion.

11.     Mr. Dopke has not agreed to share any compensation earned with respect to this

matter with any other entity. Nor does any agreement or understanding exist between Mr.

Dopke and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with this case.

WHEREFORE, Bruce Dopke requests that the Court afford him the following relief:

a.    a Final allowance of compensation in the amount of Seventy Eight Thousand Nine Hundred Seventy-One Dollars ($78,971.00), which includes the previously allowed interim compensation of $26,883.00, and the $52,088.00 of additional compensation sought by Mr. Dopke in this Motion for his legal services incurred between September 13, 2012 and September 30, 2013;

b.    a Final allowance of reimbursement of costs and expenses incurred by Mr. Dopke on behalf of the Debtor's estate, in the amount of Four Thousand Seven Hundred Ninety-Six Dollars ($4,796.00), which includes the previously allowed interim cost and expense reimbursement of $1,494.96, and the $3,301.04 of additional reimbursement of costs and expenses sought by Mr. Dopke in this Motion which he incurred between September 13, 2012 and September 30, 2013;

c.    authorization to allow Mr. Dopke to apply the $10,000.00 cost retainer which he received with respect to this case against the allowances requested in sub-paragraphs "a" and "b" above;

d.    authorization to the Trustee to pay the balance due with respect to the foregoing allowances (after application of the $10,000.00 cost retainer, as set forth above), which totals Forty-Five Thousand Three Hundred Eighty-Nine and 04/100 Dollars ($45,389.04, to Mr. Dopke from available estate funds; and

e.      such further and additional relief as the Court deems just.

Dated: September 30, 2013


/s/ Bruce Dopke
Counsel to Deborah Kanner Ebner, Trustee

Bruce Dopke, Attorney at Law
P.O. Box 681246
Schaumburg, IL 60168-1246
Tel:     847-524-4811
Fax:     847-524-4131
email: bruce@dopkelaw.com
ID: 3127052